IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CHRIST KINGDOM BUILDING WORSHIP CENTER and ELLEN WALLACE-SEARCY,<br><br>Plaintiffs,<br><br>v.<br><br>LBC2 REO LLC *et al.*,<br><br>Defendants. | 1:23CV471 |

**MEMORANDUM OPINION AND ORDER**

This case involves a church that lost its premises in a foreclosure sale. The landowner's agents showed up a month later, accompanied by law enforcement officers, and demanded that the church members leave. The church members left that same day, leaving numerous belongings inside. The church and its pastor then sued the landowner, its agents, the involved officer, and the city who employed him, claiming the incident violated both North Carolina law and the U.S. Constitution by forcing the church members out without a court order.

The case is now before the Court on three motions for summary judgment from the defendants, Docket Entries 80, 81, 83, and a motion for partial summary judgment from the plaintiffs, Docket Entry 85. The heart of the claims lies with whether the removal of the plaintiffs was forcible. The undisputed facts show that a law enforcement officer was actively involved in the defendants' efforts to take possession of the property, and they had not secured a court order prior to doing so.

Accordingly, the Court grants in part and denies in part the plaintiffs' motion, Docket Entry 85, and grants in part and denies in part the motions of the landowner and its agents, Docket Entries 80, 83. However, the Court grants in full the motion of Winston-Salem and Kiser, Docket Entry 81, because the plaintiffs' claims against them fail due to qualified immunity, *Monell*, and insufficient evidence.

With the consent of the parties, the District Judge previously referred this matter to the undersigned magistrate judge to conduct all proceedings in this case pursuant 28 U.S.C. § 636(c). *See* Docket Entry 128. Thus, this order

is a final judgment rather than a recommendation.

## I. BACKGROUND

Christ Kingdom Building Worship Center is a church with a predominantly black congregation. Docket Entry 86-2 (Wallace-Searcy Dep.) 66:19–20.[1] Ellen Wallace-Searcy is its pastor. *Id.* 55:5–7. Christ Kingdom previously occupied a plot of land and building ("the church premises") in Winston-Salem.

### A. Christ Kingdom Loses the Church Premises.

LBC2 Trust is a private company that held Christ Kingdom's mortgage loan for the church premises. Docket Entry 42 at 96–97. Christ Kingdom defaulted in the fall of 2021 and made its last payment in December 2021. Docket Entry 86 at 3; Docket Entry 88 at 10; Docket Entry 94 at 6.

LBC2 Trust purchased the church premises in a foreclosure sale in May 2022, and conveyed the premises to a separate entity, LBC2 REO LLC ("LBC2 REO"). Docket Entry 86 at 4; Docket Entry 88 at 12; Docket Entry 94 at 6. LBC2 REO hired Asset Management Alliance LLC d/b/a One Alliance Companies ("One Alliance") to manage the church premises. Docket Entry 86 at 4; Docket Entry 88 at 9; Docket Entry 94 at 6.

Defendant Lauren McElroy was an employee of One Alliance. Docket Entry 86-4 (McElroy Dep.) 14:5–9. Defendant Brad Hrebenar testified that he worked for an asset management company that served LBC2 Trust and LBC2 REO as clients. Docket Entry 95-2 (Hrebenar Dep.) 34:25, 35:1–11, 38:6–21.

### B. The Private Defendants Gain Possession of the Church Premises.

In late June of 2022, One Alliance representatives notified personnel with the Winston-Salem Police Department that they would be changing the locks on the church premises. Docket Entry 86 at 5; Docket Entry 88 at 13; Docket Entry 94 at 7. Gerald McIntyre—a handyman who One Alliance hired to change the locks—showed up at the church premises on June 29, 2022 and told Wallace-Searcy that he would be changing the locks the following day. Wallace-Searcy Dep. 34:13–17, 100:24–101:1.

On June 30, 2022, One Alliance employee McElroy arrived at the church premises to oversee the changing of the locks. Docket Entry 86 at 5; Docket Entry 88 at 14; Docket Entry 94 at 7. Two law enforcement

[1] While this opinion's citations generally refer to the pagination provided by the Court's electronic filing system, the Court uses the original pagination for depositions and other documents that provide line numbers.

officers from the Winston-Salem Police Department—C.N. Kiser and Tammy Vasquez—also arrived. Docket Entry 86 at 5; Docket Entry 88 at 14; Docket Entry 94 at 7–8. Kiser is white; Vasquez is black. Docket Entries 88-26, 88-28 (body camera footage).

Both parties extensively cite the officers' body camera footage regarding what happened next. The footage shows McElroy speaking with Officer Kiser outside the church building. Docket Entry 121-1 (Body Cam Tr.) at 1. McElroy tells Kiser, "It's been almost two years, no payment." *Id.* Kiser asks, "Were they made aware of it?" and McElroy responds, "[T]he lender has been calling for weeks now." *Id.* 2:3–7. McElroy then shows Kiser the deed to the property and explains that she works for One Alliance, the property manager. *Id.* 2:20–25, 3, 4:1–7. Kiser tells McElroy that he will go speak with the church's representatives. *Id.* 5:5–6.

Kiser enters the church building accompanied by Vasquez and finds Wallace-Searcy's office. *Id.* 6–7. Kiser tells Wallace-Searcy that "we have a company here that's saying that the . . . building has been foreclosed on." *Id.* 7:8–15. Wallace-Searcy tells Kiser, "I understand everything" but "[w]e do have a school program that's going on. They're going to be leaving it in about an hour and a half. . . . So I'm going to see if they will wait until all of that takes place." *Id.* 7:18–23.

Kiser asks, "Well, obviously, you want to get your stuff out, I would think, too. Correct?" *Id.* 724–25. Wallace-Searcy responds that she's spoken with the lender, "the person that can stop all of that," and is "waiting for him to call me back." *Id.* 8:1–11. Kiser tells her that "[t]he lady that's an agent of the lender is here now with the deed to the building. . . . if we need to stand by while y'all come to some agreement." *Id.* 8:12–18.

Wallace-Searcy tells Kiser that she only recently learned that this would be happening and has not heard from her attorney. *Id.* 9:9–12. Kiser tells Wallace-Searcy that he will fetch McElroy so "y'all can sit down and come to some agreement to figure something out. . . . Ultimately, it's a civil matter." *Id.* 10:19–25, 11:1.

Kiser and Vasquez leave Wallace-Searcy's office, and Kiser tells Vasquez that McElroy "said the church had had the note for several years now, and they hadn't made a payment in two years. I mean, I think the lender is being pretty lenient." *Id.* 11:21–25.

They reach McElroy, and Kiser tells her: "[T]hey're still having daycare in there. Like, it's still functioning. . . . So what I'm going to ask you to do is walk down there with me. . . . And y'all talk. Because ultimately, this is a civil matter. There is nothing criminal yet." *Id.* 12:22–25, 13:1–9. McElroy responds, "[W]e have the deed to the building, so it's going to be considered trespassing," and Kiser says, "Yeah. If they won't leave. [But] [t]hat's not happened." *Id.* 13:10–17.

Kiser then advises McElroy to give Wallace-Searcy time to have the kids in the building picked up and let her return at another time to get everything out of the building. *Id.* 14:14–25, 15:1–4. McElroy agrees, and Kiser adds, "[T]hat's pretty lenient. If you haven't made a payment in two years." *Id.* 15:5–14.

Kiser, Vasquez, and McElroy reenter the building and meet with Wallace-Searcy in her office. *Id.* at 22–35. Kiser begins the meeting by telling Wallace-Searcy, "You said you needed an hour and a half." *Id.* at 22:25, 23:1. But Wallace-Searcy responds, "Well, actually, I'm not leaving till—I just asked. . . . But, um, I talked with Brad Hrebenar . . . And I said Brad, I don't know anything about this. . . . . You see, he said I'm going to call you back. I'm going to try to reach out to him one more time." *Id.* at 23:2–7, 24:18–19, 25:3–5.

McElroy tells Wallace-Searcy, "Brad, as of yesterday said we are still taking possession." *Id.* 24:24–25, 25:1–2. Wallace-Searcy reiterates that she will reach out to Hrebenar. *Id.* 25:3–5. McElroy tells Wallace-Searcy, "We have to take possession," and Kiser tells Wallace-Searcy, "Right now, she's being gracious is what she's trying to say." *Id.* 25:7–10.

Wallace-Searcy calls Hrebenar, and tells him that "I didn't find out [that you would be taking possession of the building today] until One Alliance came in." *Id.* 26:2–10. Hrebenar tells her that he does not "understand how that's possible, because your attorney — I know he told you about the foreclosure." *Id.* 26:11–13. Wallace-Searcy tells him that she knew about the foreclosure, but has not heard from her attorney since, and has been trying to figure out what was going on. *Id.* 26:14–25, 27.

Hrebenar responds that "I talked to the lender. They are not willing to let you guys use the church this weekend. You can set up a time with the property manager . . . to get your stuff at some point. But you need to vacate the building today." *Id.* 28:6–11. Wallace-Searcy repeatedly asks for more time, but Hrebenar repeatedly tells her no, "this is not a negotiation. I'm not going to listen to any begging or pleading." *Id.* 28:12–25, 29:1–7. Wallace-Searcy raises the possibility of getting the mayor to make an offer on the building, but Hrebenar ultimately says, "it's done. They're going to change the locks."

Kiser then interjects: "[Y]ou don't have a problem with her waiting until the kids leave, do you?" *Id.* 29:22–24. McElroy jumps into the conversation, telling Hrebenar that they need time to allow the kids to be picked up. *Id.* 30:16–25. Hrebenar expresses skepticism, *id.* 31:2–4, and Kiser says, "In the time that we're waiting for the kids to leave, can y'all start changing the locks?" *Id.* 31:9–10.

The call ends as McElroy tells Hrebenar she will call him back, and McElroy and the officers leave Wallace-Searcy's office. *Id.* at 33–35. McElroy calls Hrebenar back, and Kiser tells them that he will "make

sure [Wallace-Searcy] understands the deadline is two o'clock or she could potentially go to jail for trespassing." *Id.* at 41:8–12. Hrebenar and McElroy agree. *Id.* at 41–42.

Kiser returns to Wallace-Searcy's office alone, and the following conversation ensues:

Kiser: Hey, Pastor, I spoke with Brad outside, and Lauren is still outside. He said that he's good with giving you till two o'clock. But at two o'clock, you have to vacate the property.

Wallace-Searcy: Okay.

Kiser: That being said, I would start gathering personal things, stuff you need to function in the near future. And you have to make arrangements with the property manager to come back to the property to get all the other stuff.

Wallace-Searcy: Okay.

Kiser: And I don't like telling you this no more than you like hearing it.

Wallace-Searcy: Yeah, yeah, yeah. Okay. Thank you.

Kiser: But there is -- but I wish you the best of luck.

Wallace-Searcy: All right.

Kiser: And I'm going to tell Lauren that we spoke, and that you have understood.

Wallace-Searcy: Okay.

Kiser: Thank you, ma'am.

Wallace-Searcy: Thank you.

*See id.* 42:19–25, 43:1–16.

At roughly 2:00 p.m., after the kids were picked up, Wallace-Searcy and all other church members vacated the building. They left numerous items inside, including a safe, which contained various papers and collection money.

Additionally, Wallace-Searcy testified that during the removal process, McIntyre told her, "I need your keys." 125:12–13. She gave him her entire key ring, telling him, "I have my personal keys on there." *Id.* 125:13–14. He said, "Okay, you'll get them back." *Id.* 125:14–15.

C. The Parties Dispute Whether the Private Defendants Returned All Personal Property.

While the parties agree that church members eventually recovered most of the personal property from the church premises, Wallace-Searcy stated in both her deposition and a declaration that the defendants never returned the safe, its contents, or her keys. Docket Entry 86-2 (Wallace-Searcy Dep.) 143:20–25, 144:1–25, 145:1–3, 179:9–12, 180:4–23; Docket Entry 114 ¶¶ 14, 16. She testified that One Alliance did deliver a safe to her, but that it was not the safe that had been taken from the church premises. Wallace-Searcy Dep. 160:15–24. She never took the safe off the delivery

truck because she didn't recognize it; she instead told the delivery driver "That's not our safe." *Id.* 160:14, 161:10, 14. Wallace-Searcy said she did not know that One Alliance never received the safe back. *Id.* 199:7–11.

In her deposition, McElory testified that she took the safe off the church premises because vendors were going to be there and the safe was open. McElroy Dep. 165–69. She went through its contents at the One Alliance office, including the contents of the envelopes it contained, all of which were already open. *Id.* McElroy could not recall whether she had been aware that McIntyre had taken Wallace-Searcy's keys, or what had been done with them. *Id.* 171:20–25, 171:1–3.

Frank Sproviero—the sole owner of One Alliance—sent an email to Hrebenar on July 1, 2022. Docket Entry 88-29 at 5–6. It described the safe as containing "$235 in cash, a bank bag of mixed coins, store receipts from between 2010 & 2016 and donation receipt books." *Id.* at 6. In his deposition, Sproviero testified that he deposited the cash in an escrow account, put the non-cash items in a folder, put the folder and check for the cash back in the safe, and sent the safe to Wallace-Searcy. Docket Entry 86-5 (Sproviero Dep.) 106–14. Sproviero testified that the check inside the safe had been cashed. *Id.* 107:23–25. He also testified that he had not been aware that anyone had asked for Wallace-Searcy's keys, and that neither he nor McElroy ever had them. *Id.* 109:23–25, 110:1–14.

The plaintiffs' attorney sent an email to the LCB2 defendants' attorney on April 14, 2023, relaying that Wallace-Searcy would not accept delivery of the safe because it was not the correct one. Docket Entry 88-40 at 2. The LCB2 defendants' attorney replied the same day stating that he had spoken to McElroy and confirmed that the safe delivered was the only one the One Alliance employees knew about. *Id.* He said that he asked McElroy to look for the check, presumably upon receiving the returned safe, to send it to Wallace-Searcy. *Id.* He also confirmed that no One Alliance employee had Wallace-Searcy's keys. *Id.*

The plaintiffs have not sued McIntyre or the vendor who delivered the safe in this case.

D. This Litigation Ensues.

Christ Kingdom and Wallace-Searcy filed a complaint based on their removal from the church premises and dispossession of their personal property. Docket Entry 38 (Compl.). They named multiple defendants, which the Court groups into the following categories:

- The private defendants:
    - The LBC2 defendants: LBC2 Trust, LCB2 REO,

Doe 1, and Brad Hrebenar
  - The One Alliance defendants: One Alliance and Lauren McElroy
- Winston-Salem and C.N. Kiser, in his official and individual capacity

There are no genuine disputes of material fact as to the following claims, which the Court grants in the plaintiffs' favor, with the issue of damages and/or award of attorney's fees to be determined at trial:

(1) Conversion against the private defendants; and
(2) Unreasonable seizure, U.S. Const. amend. IV.; 42 U.S.C § 1983, against the private defendants.

Likewise, there are no genuine disputes as the following claims, which fail as a matter of law and are dismissed:

(1) Exceeding authority to enter property, N.C. Gen. Stat. § 99A-2, against the One Alliance defendants;
(2) Abuse of process against the One Alliance defendants;
(3) Negligent infliction of emotional distress (NIED) against all defendants, brought solely by Wallace-Searcy;
(4) Violation of the due process clause, U.S. Const. amend. XIV.; 42 U.S.C § 1983, against Kiser and Winston-Salem;
(5) Violation of the equal protection clause, U.S. Const. amend. XIV.; 42 U.S.C § 1983, against all defendants;
(6) Unreasonable seizure, U.S. Const. amend. IV.; 42 U.S.C § 1983, against LCB REO; and
(7) Conspiracy to violate the Equal Protection clause, 42 U.S.C. § 1985(3), against Kiser and Winston-Salem.

Finally, the following claims survive summary judgment because of disputed factual issues:

(1) Interference with property rights, N.C. Gen. Stat. § 99A-1, as to the safe, its contents, and keys, against the private defendants; and
(2) Violation of the Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1, against the private defendants.

## II. DISCUSSION

### A. Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When "cross-motions for summary judgment are before a court, the court examines each motion separately." *T.H.E. Ins. Co. v. Davis*, 54 F.4th 805, 818 (4th Cir. 2022). This does not prevent the Court from discussing the motions' arguments together where they address the same issues. *See, e.g.*, *Christ v. Depositors Ins. Co.*, 804 F. Supp. 3d 659, 665–68 (E.D. Va. 2025); *Keith v. Merch.*, No. 1: 13-CV-2721-RMG, 2015 WL 505531, at *3 (D.S.C. Feb. 6, 2015). But it does require that the Court apply the same standard to each motion that it would to solo motions: it "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, video evidence that no reasonable jury could dispute may serve as the basis for summary judgment. *See id.* But when "video footage . . . is subject to different interpretations . . . [the] Court is [not] permitted to decide at the summary judgment stage . . . what the video footage shows." *Aleman v. City of Charlotte*, 80 F.4th 264, 293 (4th Cir. 2023).

If the North Carolina Supreme Court has not addressed an issue of state law before a federal court, the federal court must do its best to predict how the state court would rule. *Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co.*, 433 F.3d 365, 369 (4th Cir. 2005). The court "may consider . . . the practices of other states." *Id.* However, a federal court "should not create or expand a state's public policy." *Time Warner Entm't–Advance/Newhouse P'ship v. Carteret–Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007) (citation modified).

B. All Claims Against Doe 1 Are Dismissed.

The parties agree that the Court should dismiss the unnamed defendant, Doe 1. *See* Docket Entry 88 at 22; Docket Entry 112 at 28, 32. The Court grants the LBC2 defendants' motion for summary judgment in this respect. Going forward, the Court does not refer to Doe 1 when referring to the private defendants and the LBC2 defendants.

### C. All Claims Against LBC2 Trust Are Dismissed.

The LBC2 defendants argue that the plaintiffs have provided no evidence of LBC2 Trust's involvement in this affair. Docket Entry 88 at 23; Docket Entry 115 at 4. They are correct. While Hrebenar was clearly involved in the June 30, 2022 removal, all evidence points toward him being an agent of LBC2 REO, not LBC2 Trust, at that time, given that only LBC2 REO held the deed to the property. *See* Docket Entry 86 at 4; Docket Entry 88 at 12; Docket Entry 94 at 6; Hrebenar Dep. 35:1–11, 38:6–21. Further, the plaintiffs have not responded to this argument.

The court therefore dismisses all claims against LBC2 Trust. Going forward, the Court does not refer to LBC2 Trust when referring to the private defendants and the LBC2 defendants.

### D. The Plaintiffs Prevail on the Conversion Claim, with Damages to be Determined at Trial.

The plaintiffs argue that, by improperly evicting them, the private defendants converted all the personal property that remained on the church premises. Docket Entry 94 at 13–20. They have moved for summary judgment against the private defendants on this claim, *id.*,[2] and the private defendants have moved for the reverse, Docket Entry 86 at 8–12; Docket Entry 88 at 23–26.

There are "two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." *Mace v. Pyatt*, 691 S.E.2d 81, 90 (N.C. Ct.

[2] As a preliminary matter, the plaintiffs have taken conflicting positions on this issue. In their response to the One Alliance defendants' motion for summary judgment, they argue that whether Wallace-Searcy left the premises (and thus her property) voluntarily—the issue on which the conversion claim turns—is a question of fact for a jury. Docket Entry 111 at 17–18. Then, in their reply defending their motion for partial summary judgment, they appear to return to the position that the conversion issue *is* appropriate for summary judgment, arguing that the "premise that Paster Wallace-Searcy voluntarily departed" is "legally and factually wrong." Docket Entry 124 at 3–8. The Court takes the plaintiffs' most recent argument on the issue—that it is appropriate for summary judgment—to be their current position.

App. 2010). "Actual damages . . . are not an essential element of a conversion claim." *Heaton-Sides v. Snipes*, 755 S.E.2d 648, 652 (N.C. Ct. App. 2014).

A purchaser who, following a foreclosure sale, *illegally* gains possession of a former mortgagor's personal property that remains on the foreclosed premises is liable for conversion. *See id.* at 650–51; *Echols v. Branch Banking & Tr.*, No. 2:14-CV-40-FL, 2015 WL 5725521, at *4 (E.D.N.C. Sept. 30, 2015), *aff'd*, 633 F. App'x 197 (4th Cir. 2016) (unpublished). Thus, the key issue here is whether the private defendants legally gained possession of the church premises.

1. An owner may not use force in a self-help eviction against a former mortgagor of non-residential property.

In North Carolina, landlords can only remove non-residential tenants without a court order if they do so without force. *See Spinks v. Taylor*, 278 S.E.2d 501, 505 (N.C. 1981) (setting out the preceding rule for all landlord-tenant relationships); *Stanley v. Moore*, 454 S.E.2d 225, 228 (N.C. 1995) (recognizing that N.C. Gen. Stat. § 42-25.6 partially abrogated *Spinks* by making self-help eviction categorically illegal for residential tenants*); Elsayed v. Fam. Fare LLC*, No. 1:18-CV-1045, 2020 WL 4586788, at *14 n.25 (M.D.N.C. Aug. 10, 2020) (unpublished) (recognizing that self-help eviction remains legal for commercial tenants), *aff'd*, No. 21-1744, 2023 WL 5842301 (4th Cir. Sept. 11, 2023) (unpublished).

*Spinks* applies to the eviction of a commercial property's former mortgagor just as it would a tenant who rented that property, and the parties agree on this point. *See* Docket Entry 88 at 24 (LBC2 defendants' summary judgment brief); Docket Entry 94 at 14 (plaintiffs' partial summary judgment brief); Docket Entry 110 at 4–5 (One Alliance defendants' response to plaintiffs' motion for partial summary judgment). Further, while North Carolina courts have not addressed this specific scenario, other states tend to apply the rule against forcible self-help to the benefit of former mortgagors just as they would to renting tenants. *E.g., Nickens v. Mount Vernon Realty Grp., LLC*, 54 A.3d 742, 748–56 (Md. 2012) (finding self-help eviction following foreclosure sale legal so long as it was peaceable), *overturned with respect to residential property by* Md. Code, Real Prop. § 7-113. And should force become necessary, North Carolina has a statutory procedure by which a purchaser of real property may obtain a court order for possession. N.C. Gen. Stat. § 45-21.29.

For these reasons, *Spinks* controls.

2. The defendants gained possession forcibly as a matter of law.

Under *Spinks*, "an objection by the tenant elevates the reentry to a

forceful one." 278 S.E.2d at 505; *see also Stanley v. Moore*, 454 S.E.2d 225, 228 (N.C. 1995) (describing *Spinks* as standing for the principle that "[a]ny entry against the tenant's will is a forcible entry"). Courts have not fleshed out a more detailed standard in the context of evictions. *See, e.g.*, *Elsayed*, 2020 WL 4586788, at *14 (finding a self-help eviction forcible where the landlord pushed a tenant).

But there is more robust caselaw concerning creditor repossession of personal property. Courts generally hold that when a law enforcement officer actively assists a creditor in repossessing personal property without a court order, a breach of the peace has occurred. *See, e.g.*, *Roberts v. Image Recovery Serv., Inc.*, 810 F. Supp. 3d 1007, 1012 (S.D. Ill. 2025); *Albertorio-Santiago v. Reliable Fin. Servs.*, 612 F. Supp. 2d 159, 170 (D.P.R. 2009); *In re 53 Foot Trawler Pegasus*, No. 608-CV-117-ORL-18DAB, 2008 WL 4938345, at *5–6 (M.D. Fla. Nov. 18, 2008); *In re MacLeod*, 118 B.R. 1, 2–3 (Bankr. D.N.H. 1990); *First & Farmers Bank of Somerset, Inc. v. Henderson*, 763 S.W.2d 137, 141 (Ky. Ct. App. 1988); *Stone Mach. Co. v. Kessler*, 463 P.2d 651, 655 (Wash. Ct. App. 1970).

Where courts have found unauthorized police involvement in repossession *not* to constitute a breach of the peace, it was because the officer was not actively involved in the repossession, *e.g., In re Bolin & Co.*, LLC, 437 B.R. 731, 756 (D. Conn. 2010), or because the debtor was not aware that an actively involved party was an officer, *Wallace v. Chrysler Credit Corp.*, 743 F. Supp. 1228, 1234 (W.D. Va. 1990).

These cases are persuasive. Even without a direct order, by engaging the active involvement of a law enforcement officer in gaining possession of property, the party seeking possession accesses the force of the state without first going through a court. Further, the parties agree that this area of law is relevant to the present case. *See* Docket Entry 88 at 24–25 (the LBC2 defendants' summary judgment brief) (citing caselaw on repossession of personal property); Docket Entry 124 at 6 (the plaintiffs' partial summary judgment reply) (citing caselaw and the UCC on repossession of personal property).

Here, the undisputed facts demonstrate that Officer Kiser was actively involved in the private defendants gaining possession of the church premises, and, consequently, the personal property therein. Kiser actively aided McElroy and Hrebenar, allowing them to gain possession of the church premises forcibly. After initially stating she would leave, Wallace-Searcy then changed her mind and indicated she would not leave during the second meeting, *see id.* at 23:2–7, and acquiesced only after the third meeting, when Kiser, alone, told her, "[y]ou have to vacate the property," *id.* at 42:19–25, 43:1–16. Further, during the second meeting with Wallace-Searcy, McElroy told Wallace-Searcy, "We have to take possession," and Kiser

told Wallace-Searcy "Right now, she's being gracious is what she's trying to say." *Id.* 25:7–10. Then, on his own accord, Kiser suggested that the private defendants "start changing the locks" while they waited for the kids to leave. *Id.* 31:9–10.

Thus, summary judgment is appropriate for the plaintiffs as to the conversion claim.

3. The private defendants' remaining arguments against forcible possession fail.

The LBC2 defendants argue that the Court should apply the multi-factor balancing test for whether a breach of the peace occurred from *Giles v. First Virginia Credit Servs., Inc.*, 560 S.E.2d 557 (N.C. Ct. App. 2002). But courts have never applied *Giles*'s test in the context of police involvement in gaining possession of real property.

The LBC2 defendants aver that Wallace-Searcy "agreed to vacate the premises at 2:00 p.m. and did so of her own accord," Docket Entry 83 at 25, and the One Alliance defendants say that Wallace-Searcy "voluntarily vacated the commercial Premises," Docket Entry 86 at 9. But the plaintiffs say that the defendants "coerced" Wallace-Searcy's exit by using Kiser's involvement to implicitly threaten her arrest. *See, e.g.*, Docket Entry 112 at 25. The parties' subjective gloss of why the actors behaved as they did is irrelevant: the question before the Court is simply whether Officer Kiser was actively involved, and the undisputed facts – as reflected in the body worn camera footage – show that he was.

The LBC2 defendants also argue that Hrebenar is not liable because he was not physically on the church premises on June 30, 2022 and never possessed any property. Docket Entry 115 at 4. Not so. Hrebenar was involved in the removal: McElroy deferred to Hrebenar when they spoke on the phone, Hrebenar repeatedly denied Wallace-Searcy's requests for more time, and Hrebenar was involved in the decision to send Kiser to tell Wallace-Searcy that she needed to leave at 2:00 p.m. *See* Body Cam Tr. 26–42. And while there is no evidence that Hrebenar ever possessed the plaintiffs' personal property, conversion turns upon dispossession, not acquisition. *See Mace v. Pyatt*, 691 S.E.2d 81, 90 (N.C. Ct. App. 2010).

The One Alliance defendants argue that even if the plaintiffs' conversion claim succeeds, it "would be limited to the personal property which was removed without such an order . . . i.e., the safe and Wallace-Searcy's keys." Docket Entry 86 at 12. But "[a]fter an act of conversion has become complete, an offer to return or restore the property by the wrongdoer will not bar the cause of action for conversion." *Wall v. Colvard, Inc.*, 149 S.E.2d 559, 564 (N.C. 1966). The private defendants forcibly took possession, and thus they converted all the personal property belonging to the plaintiffs

that remained on the church premises.

E. The Unfair and Deceptive Trade Practices Claim Involves Genuine Issues of Material Fact.

The plaintiffs argue that the allegedly unlawful self-help removal violated the UDTPA (sometimes also referred to as UTPA). Docket Entry 94 at 20–26. They have moved for summary judgment against the private defendants on this claim, *id.*, and the private defendants have moved for the reverse, Docket Entry 86 at 12; Docket Entry 88 at 27–28.

North Carolina has outlawed—and allowed treble damages for—"unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. §§ 75-1.1(a), 75-16. The elements of a UDTPA claim are: "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (citation omitted). Additionally, the claim requires "egregious or aggravating circumstances." *Id.*; *accord United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981).

"It has been said that because '[p]roof of unfair or deceptive trade practices entitles a plaintiff to treble damages,' a UTPA count 'constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina.'" *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (quoting and citing *Allied Distribs., Inc. v. Latrobe Brewing Co.*, 847 F. Supp. 376, 379 (E.D.N.C. 1993)). "To correct this tendency, and to keep control of the extraordinary damages authorized by the UTPA, North Carolina courts have repeatedly held that 'a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1.'" *Id.* (citing cases) (alteration in original).

Thus, a practice is "unfair [under UDTPA] if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or amounts to an inequitable assertion of . . . power or position." *Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft*, Inc., 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013) (internal quotation and citation omitted) (citing cases). The circumstances must be "egregious or aggravating." *Id.* at 478. "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." *Kelly v. Ga.–Pac., LLC*, 671 F.Supp.2d 785, 799 (E.D.N.C. 2009) (collecting cases).

1. The private defendants acted unfairly and deceptively.

Although determining if an act or practice is unfair or deceptive is a

question of law for the Court, the determination is "highly dependent on specific facts of the case." *Eley v. Mid/E. Acceptance Corp. of N.C.*, 614 S.E.2d 555, 561 (N.C. Ct. App. 2005) (citation modified).

An act is unfair "if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and it is deceptive "if it has the capacity or tendency to deceive." *Ace Chem. Corp v. DSI Transp., Inc.*, 446 S.E.2d 100, 106 (N.C. 1994) (internal citations and quotations omitted). A court must consider "the effect of the actor's conduct on the consuming public"; the defendant's good faith is irrelevant. *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981); *accord Water Damage Mitigation, Inc. v. Jordan,* 909 S.E.2d 579 (N.C. Ct. App. 2024) (unpublished). A breach of the peace during repossession may be sufficient to create an unfair trade practice. *See Shue v. JMAC Distribution, LLC*, 745 F. Supp. 3d 3, 8 (D. Mass. 2024).

Here, the inquiry rests upon whether the private defendants forcibly removed the plaintiffs from the church premises. If they did—which the Court found as a matter of law, *see supra* § II.D.2.—then they acted unfairly and deceptively.

Even aside from that finding, the presence of numerous children on the premises at the time could constitute aggravating circumstances.

Furthermore, the record contains multiple instances of deception related to efforts to remove the plaintiffs:

- Hrebenar told Wallace-Searcy that he "talked to the lender" and "[t]hey are not willing to let you guys use the church this weekend." Body Cam Tr. 28:6–8. But in Hrebenar's deposition, he acknowledged that the lender had offered to let Wallace-Searcy continue to use the church premises in return for a $1,000 rent payment. Hrebenar Dep. 100–101;
- McElroy and Hrebenar repeatedly told Wallace-Searcy "we do have possession, and we have to act on it," Body Cam Tr. 26:1, "you need to vacate the building today," *id.* at 26:10–11, and "this is not a negotiation," Body Cam Tr. 28:14–15, none of which were legally accurate, and all of which were said in the presence of a law enforcement officer;
- After Kiser initially told McElroy that the issue was a "civil matter," McElroy told Kiser, "we have the deed to the building, so it's going to be considered trespassing," which was not legally accurate, either. *Id.* 13:11–12; and
- McElroy told Kiser that the plaintiffs had not paid their mortgage for two years, *id.* 1, but it is undisputed that the plaintiffs made their last

payment approximately six months earlier, Docket Entry 88 at 10 (LBC2 defendants' summary judgment brief); Docket Entry 94 at 6 (plaintiffs' partial summary judgment brief); Wallace-Searcy Dep. 74:20.

Accordingly, the private defendants' conduct was unfair and deceptive as a matter of law, and the plaintiffs are entitled to summary judgment as to the first element of the UDTPA claim.

2. The private defendants acted in or affecting commerce.

Under the UDTPA, "'commerce' includes all business activities." N.C. Gen. Stat. § 75-1.1. Courts have repeatedly held that improper evictions of renters qualify as in or affecting commerce. *See, e.g.*, *Myers v. Broome-Edwards*, 903 S.E.2d 381, 386 (N.C. Ct. App. 2024); *Elsayed*, 2020 WL 4586788, at *15.

There is no reason not to treat eviction of a former mortgagor similarly. The only argument to the contrary appears in the LBC2 defendants' brief in support of its motion for summary judgment, which purports to "preserve and restate their argument that Defendants' relationship with Plaintiffs was not in or affecting commerce . . . . (Doc. No. 42 at 16–18.)." But the incorporated pages contain no argument regarding whether the LBC2 defendants acted in or affecting commerce. *See* Docket Entry 42 at 21–23. And even if they did, the local rules forbid the LBC2 defendants from "incorporate[ing] by reference portions of another brief . . . to circumvent [length] limits." L.R. 7.3(d)(3); *see also* L.R. 7.3(d)(1) (limiting initial briefs to 6,250 words); Docket Entry 88 (containing over 7,500 words of main body text).

There are thus no genuine issues of material fact as to the second element of the UDTPA claim.

3. Whether the defendants proximately caused any injuries remains a jury question.

It is undisputed that the private defendants took possession of the plaintiffs' personal property that remained on the church premises, and that the plaintiffs eventually retrieved most of this property. The damages arising from this temporary deprivation, if any, remain disputed. *Compare* Docket Entry 112 at 20 (offering a third-party valuation of the sound system temporarily left on the church premises) *with* Docket Entry 125 at 5 (arguing the third-party valuation was biased).

Additionally, the plaintiffs argue that the private defendants never returned three items: a safe, its contents, and Wallace-Searcy's keys. Wallace-Searcy argues that she received the wrong safe and sent it back to the private defendants, and emails sent by her attorney support her deposition testimony. Wallace-Searcy Dep. 160:15–24; Docket Entry 88-40 at 2. But the private defendants' deposition testimony and email documentation indicate that they sent

Wallace-Searcy the only safe they had, that the check within it was cashed, that they never received the returned safe, and that they have never had possession of—or were even aware that Wallace-Searcy was missing—her keys. Sproviero Dep. 106–14; Docket Entry 88-40 at 2. What exactly happened to these items therefore turns at least in part on witness credibility, the domain of a jury.

No party is entitled to summary judgment on the issue of damages.

4. The defendants' remaining arguments regarding the UDTPA fail.

The LBC2 defendants argue that the plaintiffs waived their arguments regarding the UDTPA. Docket Entry 125 at 6. They are correct that the plaintiffs' response to the LBC2 defendants' motion for summary judgment did not address the arguments against the UDTPA claim. Instead, the plaintiffs argued only that UDTPA treble damages should be calculated before any offsets, *see* Docket Entry 112 at 22–23, an issue the LBC2 defendants did not raise.

"Failure to respond to an argument in briefing ordinarily results in waiver." *Mahdi v. Stirling*, 20 F.4th 846, 908 (4th Cir. 2021). Still, courts have found various circumstances to mitigate such waiver. *See, e.g.*, *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016). And mitigating circumstances exist here. The plaintiffs briefed the UDTPA issues at length in their motion for partial summary judgment, Docket Entry 94 at 20–26; Docket Entry 124 at 8–10, and their response to the One Alliance defendants' motion for summary judgment, Docket Entry 111 at 18–21. Typically, "[w]hen faced with cross-motions for summary judgment, the court must review each motion separately on its own merits." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). But here, it would not be possible to both grant summary judgment to the LBC2 defendants on the merits of their motion and grant partial summary judgment to the plaintiffs on the merits of their motion. Accordingly, the Court finds that the plaintiffs did not waive their arguments regarding the UDTPA.[3]

[3] The LBC2 defendants also argue that the plaintiffs "have not alleged vicarious liability or conspiracy [in their complaint] such to make any Defendant liable for another's conduct in violation of the UDTPA." Docket Entry 88 at 28. But in their UDTPA allegations, the plaintiffs allege that the "actions of Defendants LBC2, One Alliance, Hrebenar . . . McElroy, their agents, contractors, vendors, and employees described in this Complaint constitute unfair and deceptive acts and practices." Compl. ¶ 139. This language makes it obvious that the plaintiffs are alleging that the LBC2 defendants were vicariously liable for the actions of their agents. That the plaintiffs do not specifically use the magic words "vicarious liability" is of no consequence.

F. The Section 99A-1 Claim Is Dismissed as to Hrebenar but Involves Genuine Issues of Material Facts as to the Remaining Private Defendants.

1. The Section 99A-1 claim turns on whether the plaintiffs can prove the defendants' intent and the value of the converted goods, the first of which is disputed and the latter of which remains undefined.

The plaintiffs argue that the private defendants violated North Carolina General Statute § 99A-1 by carrying away the safe, its contents, and Wallace-Searcy's keys without returning them. Docket Entry 94 at 26–27. They have moved for summary judgment against the private defendants on this claim, *id.*, and the private defendants have moved for the reverse, Docket Entry 86 at 17–20; Docket Entry 88 at 28–29.

North Carolina General Statute § 99A-1 creates a private right of action

(1) Against "any person who has or has had, possession of [stolen] property";
(2) "knowing the property to be stolen";
(3) "when personal property is wrongfully taken and carried away";
(4) "from the owner or person in lawful possession of such property";
(5) "without his consent"; and
(6) "with the intent to permanently deprive him of the use, possession and enjoyment of said property."

Very few North Carolina courts have analyzed Section 99A-1. The cases that have done so described the statute as providing relief "only from one who is criminally guilty of receiving the stolen property." *BIOMILQ, Inc. v. Guiliano*, No. 22 CVS 255, 2024 WL 1698061, at *26 (N.C. Super. Apr. 19, 2024); *accord Noell v. Winston*, 276 S.E.2d 766, 768 (N.C. Ct. App. 1981) ("That statute created a right of action in the owner, his agent or a bailee of stolen property for recovery of damages from one who is criminally guilty of receiving stolen property."); *Russell v. Taylor*, 246 S.E.2d 569, 574 (N.C. Ct. App. 1978). To that end, North Carolina General Statute § 14-72 criminalizes the knowing receipt and/or possession of stolen goods, and sets a jurisdictional value of $1,000 or more, with certain carve outs that do not apply here. *See* N.C. Gen. Stat. § 14-72(a—b).

Here, whether the One Alliance defendants—and, through vicarious liability, LBC2 REO—unlawfully took the safe, its contents, and Wallace-Searcy's keys and never returned them, remains disputed, and the value of those items undefined. The facts do not demonstrate as a matter of law that the jurisdictional value has not been met, nor do they establish the defendants' intent related to the converted belongings.

However, there is no evidence on the record suggesting that Hrebenar was involved in the decision to remove the safe and keys from the church premises, preventing a reasonable jury from being able to find that he "carried away" either of these items. *See* N.C. Gen. Stat. § 99A-1. The Court will therefore dismiss the Section 99A-1 claim with respect to Hrebenar, and only he is entitled to summary judgment on the Section 99A-1 claim.

2. The LBC2 defendants' remaining arguments against the Section 99A-1 claim fail.

The LBC2 defendants argue that the plaintiffs waived their claim under North Carolina General Statute § 99A-1. Docket Entry 125 at 6. Similar to the UDTPA claim, the plaintiffs did not argue this claim in their responsive briefing, *see* Docket Entries 111, 112, but did argue it in support of their motion for partial summary judgment, Docket Entry 94 at 26–27. For the reasons previously discussed, *see supra* § E.4, the Court does not find that the plaintiffs waived the claim.

The LBC2 defendants also argue that Section 99A-1 does not create vicarious liability. Docket Entry 115 at 10–11. But courts generally find that so long as a statute does not expressly preclude vicarious liability, it attaches. *See, e.g., MarketPlace 4 Ins., LLC v. Vaughn*, No. 22 CVS 7588, 2023 WL 2229694, at *18 (N.C. Super. Feb. 24, 2023); *Yates v. New S. Pizza, Ltd.*, 412 S.E.2d 666, 670 (N.C. 1992).

G. The Section 99A-2 Claim Fails.

The plaintiffs argue that the One Alliance defendants violated N.C. Gen. Stat. 99A-2 by entering the church premises, of which the plaintiffs had lawful possession. Docket Entry 94 at 27–29. They have moved for summary judgment against the One Alliance defendants on this claim, *id.*, and the One Alliance defendants have moved for the reverse, Docket Entry 86 at 20–21.

"Any person who intentionally gains access to the nonpublic areas *of another's premises* and engages in an act that exceeds the person's authority to enter those areas is liable to the owner or operator of the premises for any damages sustained." N.C. Gen. Stat. § 99A-2(a) (emphasis added).

Also relevant to this issue is the law of the case doctrine, which the Court may raise *sua sponte*. *See Arizona v. California*, 530 U.S. 392, 412 (2000); *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1134–35 (8th Cir. 2007); *United States v. Matthews*, 643 F.3d 9, 12 n.2 (1st Cir. 2011). Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Columbia Gas Transmission, LLC v. RDFS, LLC*, 148 F.4th 163, 169 (4th Cir. 2025). "The doctrine applies both to questions actually decided as well as to those decided by necessary implication." *Hannah P. v. Haines*, 80 F.4th 236, 246 (4th Cir. 2023) (quotation marks omitted).

While the law of the case doctrine is not an "inexorable command," *Columbia Gas*, 148 F.4th at 169, courts do not revise the law of a case unless there is (1) "a subsequent trial producing substantially different evidence"; (2)" a change in applicable law"; or (3) a "clear error causing manifest injustice." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). Clear error is a high bar: "the prior judgment cannot be just maybe or probably wrong; it must strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish." *Jackson v. Sprint/United Mgmt. Co.*, 633 F. Supp. 3d 741, 746 (D. Md. 2022) (citation modified).

Here, the Court dismissed the plaintiffs' Section 99A-2 claim against the LBC2 defendants prior to discovery because LBC2 REO was the lawful owner of the church premises on June 30, 2022. Docket Entry 50 26–27. The Section 99A-2 claim against the One Alliance defendants persisted because the One Alliance defendants had not moved for dismissal.

However, when the Court decided that the plaintiffs had not stated a Section 99A-2 claim against LCB2 REO based on acts committed by its agents, its decision necessarily implied that the plaintiffs also had not stated a claim against those agents—i.e., the One Alliance defendants. Thus, under the law of the case, the Court must grant the One Alliance defendants' motion and dismiss this claim unless the plaintiffs show substantially different evidence, change in applicable law, or clear error.

They have made no such showing. Nor is any error apparent. The statute expressly limits liability to those who gain entry to "another's premises," N.C. Gen. Stat. § 99A-2(a), and the plaintiffs do not dispute that LBC2 REO was the lawful owner of the church premises, or that One Alliance acted as LBC2's agent, *see* Docket Entry 94 at 28.

The One Alliance defendants are therefore entitled to summary judgment on the Section 99A-2 claim.

### H. The Abuse of Process Claim Fails.

The One Alliance defendants have moved for summary judgment on the plaintiffs' abuse of process claim. Docket Entry 86 at 21–22. The plaintiffs argue that the claim presents genuine disputes of material fact. Docket Entry 111 at 33.

"[T]he elements of an abuse of process claim are: (1) a prior proceeding initiated by defendant to achieve an ulterior motive or purpose; and (2) once that proceeding was initiated, some willful act not proper in the regular prosecution of the proceeding was committed." *Universal Underwriters Ins. Co. v. Lallier*, 334 F. Supp. 3d 723, 734 (E.D.N.C. 2018) (citation modified); *accord Semones v. S. Bell Tel. & Tel. Co.*, 416 S.E.2d 909, 913 (N.C. Ct. App. 1992). "The ulterior motive requirement is satisfied when the plaintiff alleges

that the prior action was initiated by the defendant or used by him to achieve a purpose not within the intended scope of the process used." *Universal Underwriters*, 334 F. Supp. 3d at 734. For example, gaining ownership of a property is the intended purpose of a foreclosure action, and therefore cannot be an ulterior motive for such an action. *Schwartz v. OneWest Bank, FSB*, 614 F. App'x 80, 83–84 (3d Cir. 2015) (unpublished).

Here, the Court dismissed the plaintiffs' abuse of process claim against the LBC2 defendants prior to discovery because the plaintiffs had insufficiently alleged an ulterior motive. Docket Entry 50 at 28–29. The Court did not dismiss the same claim against the One Alliance defendants because they did not so move.

Now, the One Alliance defendants have moved for summary judgment on the abuse of process claim. Docket Entry 86 at 21–22. The plaintiffs argue that "One Alliance's ulterior purpose was obtaining immediate possession without complying with" the statutory procedure for obtaining a court order for possession of real property following a foreclosure sale. Docket Entry 111 at 34.

But here, as in *Schwartz*, 614 F. App'x at 83–84, gaining possession is not an *ulterior* motive—rather, it is the *intended purpose* of the actions taken. As already discussed, the One Alliance defendants were the agents of the LBC2 defendants, who were allowed to attempt to gain possession of the premises they owned. Even if a jury determines that they did so incorrectly, the plaintiff identifies no precedent—nor has the Court found any—for procedural violations being sufficient to convert an intended purpose into an ulterior motive.

The One Alliance defendants are therefore entitled to summary judgment on the abuse of process issue.

I. The Negligent Infliction of Emotional Distress Claim Fails.

All defendants have moved for summary judgment on Wallace-Searcy's NIED claim. Docket Entry 84 at 15–17, 21–22; Docket Entry 86 at 22–25; Docket Entry 88 at 29–31. Wallace-Searcy argues that the claim presents genuine disputes of material fact. Docket Entry 111 at 29–33; Docket Entry 112 at 29–31; Docket Entry 113 at 29.

The Court grants the defendants' motions on this claim. Governmental immunity bars the NIED claim against Winston-Salem. All remaining defendants are entitled to summary judgment on the NIED claim because there are no genuine issues of material fact regarding whether Wallace-Searcy's emotional distress meets the requirements of the claim.

1. Governmental immunity bars the NIED claim against Winston-Salem.

Governmental immunity applies to any "suit for torts committed while the officers or employees are performing a governmental function." *Willis v. Town of Beaufort*, 544 S.E.2d 600, 605 (N.C. Ct. App. 2001). "Law enforcement is well-established as a governmental function." *Hinson v. City of Greensboro*, 753 S.E.2d 822, 827 (N.C. Ct. App. 2014). However, a city may waive its governmental immunity by purchasing liability insurance. *See* N.C. Gen. Stat. § 160A-485.

Here, Winston-Salem has produced evidence that it has not purchased liability insurance. Docket Entry 84-2 ¶¶ 4–5, Affidavit of Julie Carter. Wallace-Searcy argues that this "creates a fact question about the scope of coverage, not entitlement to judgment." Docket Entry 113 at 29. But Wallace-Searcy has produced no evidence—or even argument—in favor of Winston-Salem having such coverage, *see id.*, so no reasonable jury could find that Winston-Salem had liability insurance.

Wallace-Searcy also argues that governmental immunity does not apply because Kiser acted outside the scope of his authority. Docket Entry 113 at 29. But this an exception to public official immunity—i.e., the immunity a North Carolina public official receives in their individual capacity—not governmental immunity. *Compare Willis*, 544 S.E.2d at 605 *with Hwang v. Cairns*, 915 S.E.2d 425, 429 (N.C. 2025). Governmental immunity therefore bars Wallace-Searcy's NIED claim against Winston-Salem.

2. Wallace-Searcy has not produced sufficient evidence of emotional distress.

The elements of negligent infliction of emotional distress are "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Wilkerson v. Duke Univ.*, 748 S.E.2d 154, 159 (N.C. Ct. App. 2013) (citing *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. Ct. App. 1990)). Severe emotional distress is a "emotional or mental disorder, such as . . . neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson*, 395 S.E.2d at 97. High blood pressure qualifies as severe emotional distress. *O'Neal v. Harrison*, No. 5:14-CV-198-FL, 2015 WL 1084321, at *10 (E.D.N.C. Mar. 11, 2015).

Even assuming *arguendo* that a genuine issue of material fact exists on the first two NIED elements, there is none on the third. Wallace-Searcy argues that the unlawful eviction exacerbated her high-blood pressure. But even when the evidence is construed in the light most favorable

to the plaintiffs, it shows that Wallace-Searcy's blood pressure did not worsen until at least 15 months after the eviction. *See* Docket Entry 111 at 30; Docket Entry 112 at 30; Docket Entry 113 at 29; Docket Entry 119-11 at 1. And Wallace-Searcy's only other evidence for a causal relationship is the fact that her condition worsened despite treatment, and her denial of other stressors in her life. *See* Docket Entry 111 at 31. Such evidence cannot reasonably support a finding of causation.

All defendants are therefore entitled to summary judgment on the NIED claim.

J. All Constitutional Claims Against Kiser in His Individual Capacity Are Dismissed.

Kiser has moved for summary judgment in his favor on the plaintiffs' due process, equal protection, and unreasonable seizure claims brought against him in his individual capacity under 42 U.S.C. § 1983. Docket Entry 84 at 5–15. He argues that qualified immunity bars all three claims. *Id.* The plaintiffs argue that Kiser violated their clearly established rights with respect to the due process and unreasonable seizure claims. Docket Entry 113 at 8–22. They do not respond regarding their equal protection claim and have therefore waived that claim against Kiser in his individual capacity. *See Mahdi v. Stirling*, 20 F.4th 846, 908 (4th Cir. 2021) (finding failure to respond constitutes waiver). Additionally, the plaintiffs only moved for summary judgment with respect to the unreasonable seizure claim. Docket Entry 94 at 29.

"The affirmative defense of qualified immunity protects law enforcement officers against lawsuits seeking money damages from them in their individual capacity." *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 605 (E.D.N.C. 2009). "Qualified immunity . . . has two prongs: Courts must decide whether a constitutional right was violated on the facts alleged and whether "the unconstitutionality of the officers' conduct was clearly established." *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022). A court has discretion over which prong it addresses first, and it need not address both if one disposes of the issue. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Regarding the second prong, a right is clearly established when it "is dictated by controlling authority or a robust consensus of cases of persuasive authority." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (quotation marks omitted); *accord Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023). In determining whether a right was clearly established, the right must "not be defined at a high level of generality" but rather, "with such particularity as to apply clearly to the specific circumstances facing the officer." *Belton v. Loveridge*, 129 F.4th 271, 279 (4th Cir. 2025).

Regarding the first prong – whether a constitutional right was violated – a

"robust consensus of persuasive authority" has found that a law enforcement officer's active involvement in an eviction or repossession is a form of state action that can support a Section 1983 cause of action. *See Hyman v. Morris*, 320 F. Supp. 3d 707, 720 (W.D. Pa. 2018) (internal quotation and citation omitted); *Hensley v. Gassman*, 693 F.3d 681, 692 (6th Cir. 2012); *Marcus v. McCollum*, 394 F.3d 813, 822–23 (10th Cir. 2004) *recognized as overruled on other grounds by Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1071 (10th Cir. 2023); *Waisner v. Jones*, 755 P.2d 598, 601 (N.M. 1988); *Howerton v. Gabica*, 708 F.2d 380, 385 (9th Cir. 1983); *Walker v. Walthall*, 588 P.2d 863, 866 (Az. Ct. App. 1978).

This line of authority has examined whether any state action occurred at all, and therefore applies regardless of whether the plaintiff claims that the action violated the due process clause or the right against unreasonable seizures. *See, e.g.*, *Hyman*, 320 F. Supp. 3d at 720 (unreasonable seizure); *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981) (due process).

But "merely knowing that law enforcement officials can violate the Fourth Amendment by actively participating in a wrongful repossession" does not put a law enforcement officer on notice "that his particular conduct was unconstitutional." *Atkinson v. Godfrey*, 100 F.4th 498, 506 (4th Cir. 2024) (citation modified). "To the contrary, it begs the critical question—what conduct crosses the line in a private repossession from peacekeeping to actively participating?" *Id.* The *Atkinson* court found that where the line is drawn, it was not clearly established to the officer defendant in that case.

The facts there: in an attempt to prevent the repossession of her car, the plaintiff sat in it as a tow truck lifted it in the air. *Id.* at 502. A law enforcement officer arrived and ordered the plaintiff out of the car so that the creditor could take it. *Id.* Because it was not clearly established that these specific actions constituted active involvement in a repossession, the officer received qualified immunity. *Id.* at 506–08.

Under *Atkinson*, Kiser is entitled to the same. While he was actively involved in the taking, the threshold of active involvement was not so clearly established that Kiser reasonably could have been expected to know his specific actions violated the Constitution.

The plaintiffs' reliance on *Marshall v. Marshall*, 523 F. Supp. 3d 802, 824 (E.D. Va. 2021) is unavailing. Docket Entry 113 at 11–13. There, the district court considered whether a reasonable officer would suspect that a protective order was improperly issued under certain suspicious circumstances. *Id.* This provides little guidance to the issue before this Court, is not binding authority, and arose three years prior to *Atkinson*.

Likewise, *State v. McCants*, 854 S.E.2d 415 (N.C. Ct. App. 2020) is equally unhelpful. *See* Docket Entry 113 at 14 (arguing that "*McCants* establishes that acquiescence under police threats is not voluntary[]"). *McCants* involved a warrantless search, not a police-involved eviction. *See generally McCants*, 854 S.E.2d 415. Thus, neither *Marshall* nor *McCants* clearly define a right "with such particularity as to apply clearly to the specific circumstances facing" Kiser. *See Belton*, 129 F.4th at 279.

Qualified immunity therefore bars the plaintiffs' claims against Kiser in his individual capacity.

K. *Monell* Bars the Section 1983 Claims Against Winston-Salem and Kiser in His Official Capacity.

Kiser in his official capacity and Winston-Salem have moved for summary judgment on the plaintiffs' constitutional claims against them, arguing that those claims fail to satisfy *Monell*. Docket Entry 84 at 18–21. The plaintiffs responded that genuine issues of material fact exist on these claims, warranting a trial. Docket Entry 113 at 23–28. Then, when briefing their motion for partial summary judgment, the plaintiffs argued that they are entitled to summary judgment on their unreasonable seizure claim against Winston-Salem, because the record evidence shows that they have satisfied *Monell* as a matter of law. Docket Entry 94 at 31–32. As referenced, *supra* § D, the Court will treat the plaintiffs' most recent argument as their current position. Regardless, summary judgment is appropriate in favor of the defendants on this issue.

As a preliminary note, the plaintiffs' claims against Kiser in his official capacity are actually claims against the municipal entity of which he is an agent. *See Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982) ("[O]fficial capacity suits generally represent but another way of pleading an action against the entity of which the officer is an agent.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). That entity is Winston-Salem. *See* Docket Entry 40 ¶ 19. The claims against Kiser and against Winston-Salem discussed in this subpart are therefore duplicative.

Turning to the main analysis: *Monell* forbade courts from holding a municipality liable under Section 1983 for the acts of its employees. *See* 436 U.S. 658, 691 (1978). A municipality is liable only if it "follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). The Fourth Circuit has identified four ways to satisfy *Monell*:

(1) "Through an express policy, such as a written ordinance or regulation;"
(2) "Through the decisions of a person with final policymaking authority;"

(3) "Through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or"
(4) "Through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law."

*Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (citation modified).

Here, the plaintiffs make the second and third *Monell* claims: that Sgt. C.S. Sloan ratified Officer Kiser's actions, and that Winston-Salem did not properly train officers regarding foreclosure and evictions. Amended Compl. ¶¶ 177–78. Neither succeed.

1. The plaintiffs have not shown a failure to train.

"Because *Monell* liability cannot be predicated on a theory of respondeat superior, a single incident is almost never enough to warrant municipal liability." *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), *as amended* (June 10, 2020). The exception is where, "in light of the duties assigned to specific officers or employees the need for more or different training [is] obvious, and the inadequacy [is] likely to result in the violation of constitutional rights." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Returning to *Atkinson*, after the Fourth Circuit found the officer should receive qualified immunity and remanded the matter for further proceedings, this Court determined that *Monell* barred the sheriff's office's liability. *Atkinson v. Coats*, No. 1:22-CV-369, 2025 WL 2712660, at *6–7 (M.D.N.C. Sept. 23, 2025). The Court found that the lack of a clear rule defining how officers could be involved in repossessions prevented the sheriff's office from being on notice that the officers needed different training. *Id.*

Here, the plaintiffs have produced no evidence of a pattern of improper officer involvement in evictions in Winston-Salem. They therefore rely on the *Canton* exception, arguing that "Winston-Salem's own training manual acknowledges that 'landlord-tenant disputes and repossession of property are civil disputes,' but provides no guidance on when officers may properly assist private parties in taking possession and when they must require court orders." Docket Entry 113 at 24–25.

This argument fails for the same reason that Kiser is entitled to qualified immunity: it was not clearly established law what participation in evictions/foreclosures would violate the Constitution at the time. So, then, what should the training manual have said? It would be too much to expect the training manual to piece together the authority on the subject as this opinion does. This Court's decision in *Atkinson*, 2025 WL at *6–7, is persuasive: the need for more or different training was not "obvious," *see Canton*, 489 U.S. at 390,

preventing *Monell* liability from attaching.

2. The plaintiffs have not shown a decision by a person with final policymaking authority.

Kiser's direct supervisor, Sergeant Sloan, arrived on the church premises at some point on June 30, 2022. Docket Entry 84-9 (Katherine Allen Dep.) 23:25, 24:1–16. The plaintiffs argue that whether Sloan's arrival "constituted ratification of Kiser's conduct presents a factual dispute that precludes summary judgment." Docket Entry 113 at 27.

But even assuming *arguendo* that Sloan ratified Kiser's actions, no reasonable jury could find that Sloan had final policymaking authority based on the record evidence. The plaintiffs have produced no evidence to that effect, and do not even argue that they have done so in their briefing. *See* Docket Entry 113 at 27. And Winston-Salem has produced evidence that the police chief, not Sloan, has final policymaking authority. *See* Docket Entry 84-4 ¶ 3, Affidavit of Chief of Police William H. Penn, Jr.

Winston-Salem and Kiser in his official capacity are therefore entitled to summary judgment on the plaintiffs' ratification theory of *Monell* liability.

L. The Equal Protection Claim Against the Private Defendants Fails.

The private defendants have moved for summary judgment on the plaintiffs' equal protection claim. Docket Entry 86 at 26–30; Docket Entry 88 at 32–35. The plaintiffs have responded that the issue involves genuine issues of material fact. Docket Entry 111 at 28; Docket Entry 112 at 26.

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Nance v. City of Albemarle, N. Carolina*, 520 F. Supp. 3d 758, 779 (M.D.N.C. 2021) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

Succeeding on an equal protection claim requires a plaintiff to demonstrate that (1) she "has been treated differently from others with whom [she] is similarly situated," and (2) "that the unequal treatment was the result of intentional or purposeful discrimination." *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *accord Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 112 (4th Cir. 2023). Failure to show other, similarly situated individuals who were treated differently results in summary judgment against a claimant. *E.g., Tri Cnty. Paving, Inc.*

*v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir. 2002); *Maisha v. Univ. of N. Carolina*, No. 1:12-CV-371, 2015 WL 277747, at *7 n.8 (M.D.N.C. Jan. 22, 2015), *aff'd*, 641 F. App'x 246 (4th Cir. 2016) (unpublished).

Here, the plaintiffs alleged in their complaint that the private defendants treated white businesses differently than black businesses. Compl. ¶¶ 59–60. The Court relied on these allegations when denying the private defendants' motions to dismiss. *See* Docket Entry 50 at 49.

But now, at summary judgment, the plaintiffs have not even attempted to show other, similarly situated white businesses whom the private defendants treated differently. *See* Docket Entry 111 at 28; Docket Entry 112 at 26. The private defendants are therefore entitled to summary judgment on the equal protection claim.

M. The Unreasonable Seizure Claim Fails Against LBC2 REO but Prevails as to the Remaining Private Defendants.

The plaintiffs have moved for summary judgment on their unreasonable seizure claim against all defendants. Docket Entry 94 at 29–32. The Court already disposed of that claim with respect to Kiser and Winston-Salem. The private defendants also filed motions for summary judgment on the claim. Docket Entry 86 at 26–30; Docket Entry 88 at 32–35. The Court grants the LBC2 defendants' motion in part, and in all other respects finds in favor of the plaintiffs, with the issue of damages to be determined later.

1. Vicarious liability is not available against LBC2 REO.

Vicarious liability does not exist for Section 1983 claims, even when the defendant is a private actor. *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). The One Alliance defendants did not raise this argument in their briefing; however, the LBC2 defendants did. Docket Entry 88 at 33. The plaintiffs must therefore show that their Fourth Amendment claims against LBC2 REO satisfy *Monell*. But they have made no argument to that effect, much less evidenced it. Therefore, the plaintiffs cannot proceed against LBC2 REO for violating Section 1983 under a theory of vicarious liability.

2. The Remaining Private Defendants were State Actors.

Section 1983 allows individuals to recover damages for constitutional violations committed "under color of" state law. 42 U.S.C. § 1983. Courts have limited this liability to state actors. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 659 (4th Cir. 1998); *accord Smith v. Donahoe*, 917 F. Supp. 2d 562, 568 (E.D. Va.), *aff'd in part, appeal dismissed in part,* 542 F. App'x 230 (4th Cir. 2013) (unpublished). A private party can perform as a state actor in several contexts, including "when the state has committed an unconstitutional

act in the course of enforcing a right of a private citizen." *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993); *accord Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 628 (E.D. Va.), *aff'd*, 774 F. App'x 162 (4th Cir. 2019).

Private parties taking possession of property are state actors when law enforcement actively aids them. *See, e.g., Waisner v. Jones*, 755 P.2d 598, 603 (N.M. 1988); *Howerton v. Gabica*, 708 F.2d 380, 384–85 (9th Cir. 1983); *Walker v. Walthall*, 588 P.2d 863, 866 (Ariz. Ct. App. 1978). While there is no bright line between an officer standing by and providing active aid, at "some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." *Howerton*, 708 F.2d at 383. "[A]ffirmative intervention, aid, intimidation, or other use of power . . . converts [an officer] from a neutral third party to, in effect, an assistant of the repossessing party." *Mitchell v. Gieda*, 215 F. App'x 163, 165 (3d Cir. 2007) (unpublished). And because the private defendants took possession of the church premises with the active aid of Kiser, they performed as state actors.

The One Alliance defendants argue that this Court should follow *Sherry v. Assocs. Com. Corp.*, 60 F. Supp. 2d 470 (W.D. Pa. 1998), *aff'd,* 191 F.3d 445 (3d Cir. 1999). *Sherry* found that a creditor repossessing trucks was not a state actor, despite a law enforcement officer telling the debtor, "You have to let them have the trucks." 60 F. Supp. 2d at 472–76. The court characterized the law enforcement officer's participation as "not significant since it contributed nothing to the remedy of self-help repossession." *Id.* at 476.

*Sherry* is not persuasive. It contradicts the bulk of the caselaw, as laid out above. Indeed, the Western District of Pennsylvania has since found that *Sherry*'s "significant aid" standard has been replaced by an "affirmative aid" standard under which *Sherry*'s outcome might have been different. *Hyman v. Morris*, 320 F. Supp. 3d 707, 717 n.70 (W.D. Pa. 2018).

And the facts here are distinguishable from *Sherry*. There, law enforcement officers remained at a distance until tempers flared and did not speak to the debtor until spoken to. *Sherry*, 60 F. Supp. 2d at 475. Here, Kiser initiated conversation with Wallace-Searcy from the start and remained involved in the interactions between her and the private defendants until she left the church premises.

3. The LBC2 defendants' remaining arguments against Section 1983 liability fail.

The LBC2 defendants argue that if they are state actors under Section 1983, they should receive qualified immunity. Docket Entry 88 at 34. "[W]hen determining whether a private party acting under color of state law is entitled to qualified immunity, the Supreme Court has instructed courts to look both to

history and to the purposes that underlie government employee immunity." *Gregg v. Ham*, 678 F.3d 333, 340 (4th Cir. 2012) (quotation marks omitted) (citing *Richardson v. McKnight*, 521 U.S. 399, 404 (1997)). "If history does not reveal a firmly rooted tradition of immunity, and the policy considerations underlying qualified immunity do not apply to the category of private persons of which the defendant is a part, then he is not entitled to qualified immunity." *Id.* (citation modified).

Here, the LBC2 defendants have made no showing of a historical tradition of immunity for purchasers gaining possession of property following foreclosure sales, nor could the Court find any indication of such a tradition in the caselaw. Accordingly, the LBC2 defendants are not entitled to qualified immunity.

The LBC2 defendants also argue that the plaintiffs are seeking only attorney's fees, not damages, for their constitutional claims. Docket Entry 88 at 32. This, they argue, is not permissible. *Id.*

The plaintiffs have not responded to this argument, which would typically constitute a waiver. *See supra* § E.4. But mitigating circumstances again exist. The LBC2 defendants base their argument on the plaintiffs' initial disclosure, which only lists the plaintiffs as seeking "reasonable attorneys' fees not yet determined for due process violations pursuant to 42 U.S.C. §§ 1983, 1985." *See* Docket Entry 88-38 at 11. It does not specify what damages the plaintiffs seek for their non-due process claims under Section 1983—i.e., their equal protection and unreasonable seizure claims. And the unreasonable seizure claim is now the only surviving constitutional claim against the LCB2 defendants (specifically, Hrebenar). Further, the Complaint states that the plaintiffs seek damages for their equal protection and unreasonable seizure claims. Amended Compl. ¶¶ 188, 195.

Thus, even assuming *arguendo* that the LBC2 defendants are correct that the plaintiffs cannot bring their unreasonable seizure claim for attorney's fees alone, they have not shown that this is all the plaintiffs seek. The issue of attorney's fees and damages will thus proceed to trial.[4]

[4] The LBC2 defendants also argue that the plaintiffs "cannot argue on the one hand that Defendants' actions violated state eviction rules and, on the other, call Defendants state actors" because "[s]uch a dual argument is directly foreclosed by" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Docket Entry 88 at 34. *Lugar* reasoned that "action by a private party pursuant to [a state] statute, without something more, [is] not sufficient to justify a characterization of that party as a state actor." 457 U.S. at 939 (citation modified). Thus, a private party who—acting alone—deprived another of property was not a state actor just because they abused a statutory process to do so. *See id.* at 940. *Lugar* has little relevance to the present case, where the

N. The Plaintiffs Waived Their Section 1985(3) Claim.

Prior to discovery, the Court dismissed the plaintiffs' claim under 42 U.S.C. § 1985(3) against the private defendants, but not Kiser and Winston-Salem, as they submitted no motion therefor. Docket Entry 50 at 56–58, 60–61. Now, Kiser and Winston-Salem have so moved. Docket Entry 84 at 17–18. The plaintiffs did not respond, *see* Docket Entry 113; Docket Entry 126 at 12, and failed to address this issue in their motion for partial summary judgment, *see* Docket Entries 94, 124.

The plaintiffs have therefore waived their Section 1985(3) claim with respect to Kiser and Winston-Salem. *See Mahdi v. Stirling*, 20 F.4th 846, 908 (4th Cir. 2021). Summary judgment in Kiser and Winston-Salem's favor is appropriate.

III. MOTIONS TO SEAL MEDICAL RECORDS

The parties have filed two uncontested motions requesting that the Court seal Wallace-Searcy's medical records filed in support of various summary judgment briefings. Docket Entries 93, 105 (response in support of Docket Entry 93), 118. *See also* Docket Entries 88-45 (public version of sealed medical records), 92 (sealed version of Docket Entry 88-45), 116-11 (public version of sealed medical records), 119-11 (sealed version of Docket Entry 116-11).

The Court gave the public proper notice and opportunity to object, and the plaintiffs have shown that the sealing requests are narrowly tailored to protect a compelling interest. Accordingly, the Court grants both motions.

A. The Public Had Notice and Opportunity to Object.

Before addressing a motion to seal, a court must give the public notice and a reasonable opportunity to contest the motion. *Doe v. Public Citizen,* 749 F.3d 246, 272 (4th Cir. 2014). The duty to provide notice is satisfied when a motion to seal is docketed "reasonably in advance of deciding the issue." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988) (citing *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984)); *see also Hunter v. Town of Mocksville*, 961 F. Supp. 2d 803, 806 (M.D.N.C. 2013) (finding one month and a day satisfied "the 'public notice' prerequisite to entry of a sealing order").

Here, the most recently filed motion at issue was docketed on November 14, 2025. Docket Entry 118. This has provided the public with adequate notice and a reasonable opportunity to intervene, and no objections have been raised.

---

undisputed facts demonstrate that a private party deprived another of property with the active aid of law enforcement.

## B. The Sealing Requests Are Narrowly Tailored to Protect a Compelling Interest.

The First Amendment creates a right of public access to documents filed in connection to summary judgment. *Gray Media Grp., Inc. v. Loveridge*, 155 F.4th 330, 339 (4th Cir. 2025). However, the right of access is not absolute and can be rebutted. *Rushford v. New Yorker, Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988).

To overcome the right of access based on the First Amendment, a party must show "a compelling governmental interest" and that the restriction is "narrowly tailored." *Public Citizen,* 749 F.3d at 266. "It is well-established that the need to protect medical privacy can be a compelling reason for sealing records." *Qayumi v. Duke Univ.*, No. 1:16-CV-1038, 2018 WL 2025664, at *5 (M.D.N.C. May 1, 2018), so long as the sealing request is not too broad, *see Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).

Here, a compelling interest in confidentiality exists because the information is Wallace-Searcy's private medical records. And the fact that the sealed files are entirely medical information means that there is no more narrowly tailored approach possible than sealing the documents entirely.

Further, the documents contain only medical information largely irrelevant to this Court's decision. The only information relied upon was the fact that Wallace-Searcy's high blood pressure did not worsen until at least fifteen months after June 30, 2022. And the plaintiffs already provided this information to the public in their briefing. *See* Docket Entry 111 at 30; Docket Entry 112 at 30.

Accordingly, the Court grants the motions to seal, Docket Entries 93, 118, and orders that Wallace-Searcy's medical records, Docket Entries 92, 119-11, remain sealed.

# IV. MOTION TO SEAL BODY CAMERA FOOTAGE TRANSCRIPTS

The plaintiffs originally moved to seal transcripts of body camera footage filed at Docket Entries 98-1 and 98-2. Docket Entry 99. However, upon learning that Winston-Salem no longer claimed confidentiality over the footage, the plaintiffs retracted their motion. Docket Entry 100.

The Court therefore denies the motion to seal, Docket Entry 99, as moot, and instructs the Clerk to unseal Docket Entries 98-1 and 98-2.

# V. CONCLUSION

IT IS HEREBY ORDERED that the plaintiffs' motion for partial summary judgment, Docket Entry 85, is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the following claims, with award of damages and/or attorney's fees to be determined at trial:

(1) Conversion against the private defendants; and
(2) Unreasonable seizure, U.S. Const. amend. IV.; 42 U.S.C § 1983, against the private defendants.

Kiser and Winston-Salem's motion for summary judgment, Docket Entry 81, is GRANTED, and all claims against them are DISMISSED.

The LBC2 defendants' motion for summary judgment, Docket Entry 80, is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the following claims, and they are DISMISSED:

(1) All claims against Doe 1;
(2) All claims against LBC2 Trust;
(3) N.C. Gen. Stat. 99A-2 claim against the LBC2 defendants;
(4) Abuse of process against the LBC2 defendants;
(5) Negligent infliction of emotional distress against the LCB2 defendants;
(6) Equal protection against the LCB2 defendants; and
(7) Unreasonable seizure against LCB2 Trust and LCB2 REO.

The One Alliance defendants' motion for summary judgment, Docket Entry 83, is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the following claims, and they are DISMISSED:

(1) N.C. Gen. Stat. 99A-2 claim against the One Alliance defendants;
(2) Abuse of process against the One Alliance defendants;
(3) Negligent infliction of emotional distress against the One Alliance defendants; and
(4) Equal protection against the One Alliance defendants.

The motions to seal at Docket Entries 93 and 118 are GRANTED. Wallace-Searcy's medical records at Docket Entries 92 and 119-11 shall remain sealed.

The motion to seal at Docket Entry 99 is DENIED as moot.

In accordance with this Order, the following claims will move forward to trial, along with the above-referenced issues of award of monies:

(1) UDTPA violation against LBC2 REO, Hrebenar, One Alliance, and McElroy; and
(2) N.C. Gen. Stat. § 99A-1 claim against LBC2 REO, One Alliance, and McElroy.

The Clerk shall unseal Docket Entries 98-1 and 98-2. The Clerk shall also terminate the following defendants: Kiser, Winston-Salem, Doe 1, and LBC2 Trust.

JoAnna Gibson McFadden
United States Magistrate Judge

September 30, 2026
Durham, NC